IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs December 4, 2023

IN RE DANIEL W., ET AL.[1]

Appeal from the Circuit Court for Bradley County
No. V22-310        J. Michael Sharp, Judge

_____

No. E2023-00923-COA-R3-PT
_____

This action involves the termination of a mother's parental rights to her minor children. Following a bench trial, the court found that clear and convincing evidence existed to establish the following statutory grounds of termination: (1) the persistence of conditions which led to removal; (2) substantial noncompliance with the permanency plans; and (3) failure to manifest an ability and willingness to assume custody of the children. The court also found that termination was in the best interest of the children. We affirm the trial court's termination decision.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court
Affirmed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the court, in which W. NEAL MCBRAYER and KENNY ARMSTRONG, JJ., joined.

Wilton Marble, Jr., Cleveland, Tennessee, for the appellant, Tylena B.

Jonathan Skrmetti, Attorney General & Reporter, and Katherine P. Adams, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

OPINION

I.        BACKGROUND

Daniel W. and Desiree W. (collectively "the Children") were born to Tylena B. ("Mother") in August 2013 and July 2014, respectively. Mother was married to Kevin B.

---

[1] This court has a policy of protecting the identity of children in parental rights termination cases by initializing the last name of the parties.

when Daniel was born; however, Mr. B. was excluded as the father.[2]  Mother identified Delmar W. ("Father") as Daniel's father and later as Desiree's father.

The Tennessee Department of Children's Services ("DCS") removed the Children from Mother and Father's home on September 6, 2018, due to allegations of domestic violence and drugs in the home.  Father failed to participate in the DCS proceedings, and the court entered a no contact order between Father and the Children.  Mother complied with the requirements of her permanency plan and reunited with the Children in June 2019.

On February 4, 2021, DCS received another referral regarding the Children, alleging psychological harm and physical abuse.  Mother and the Children had returned to Father's home, where it was alleged that he shot one child with a BB gun and held the BB gun to Mother's face.  Mother admitted to drug use and tested positive for methamphetamine, amphetamine, THC, and MDMA, also known as ecstasy.  Father left before testing.

The Children were later adjudicated as dependent and neglected.  Mother did not appear for the probable cause hearing or the adjudicatory hearing.  On March 2, 2021, DCS developed a permanency plan for Mother with a goal of returning the Children to her.  She did not participate in the creation of the plan, but a copy of the plan and the Criteria and Notice of Termination of Parental Rights were mailed to her last known address.  The plan, which was ratified by the trial court on April 22, contained the following requirements:  (1) obtain an alcohol and drug assessment and follow recommendations; (2) refrain from socialization with known drug users; (3) refrain from substances that will yield a positive result for THC, specifically Delta 8 CBD; (4) submit to random drug screens; (5) complete a mental health assessment and follow recommendations; (6) participate in individual counseling with an emphasis on anger management and domestic violence; (7) refrain from acts of violence in front of the Children; (8) arrive on time for visitation and provide necessary items; (9) provide a rental lease agreement in her name; (10) pay child support; (11) obtain and maintain residential stability for six months with working utilities in her name; (12) provide a valid driver's license, proof of insurance, and vehicle registration; (13) maintain contact with DCS and notify of any changed circumstances within 24 hours; (14) provide proof of legal income; (15) participate in parenting classes; and (16) participate in domestic violence support groups.

Mother did not maintain contact with the Children or DCS following removal for approximately seven months.  Mother was arrested three times in Summer 2021 and was convicted of public intoxication, disorderly conduct, and resisting arrest.  In June 2021, she was involuntarily committed and diagnosed with methamphetamine induced psychosis.  She moved back in with Father upon her release.  Mother visited the Children on September 14, 2021.  She tested positive for amphetamine, methamphetamine, and THC at the visit.

---

[2] Mother and Mr. B. were divorced by order of the court on January 8, 2014.

- 2 -

Mother then moved to Ohio, where Mother made some initial progress on the permanency plan, prompting DCS to file paperwork to start the Interstate Compact on the Placement of Children ("ICPC"). Ohio denied the application, citing a recent positive drug test for fentanyl and Mother's living situation.

On May 31, 2022, DCS filed the termination petition based upon the following statutory grounds: (1) persistence of conditions which led to removal; (2) substantial noncompliance with the permanency plans; and (3) failure to manifest an ability and willingness to assume custody of the children.[3]

In July 2022, Mother entered a detoxification program. Upon her release, she began her second attempt at completing the permanency plan requirements. She also moved in with her ex-husband, Mr. B., who assisted her in her efforts. Mother regularly spoke with the Children, and the Children came to Ohio for an in person visit in December 2022.

The case proceeded to a hearing on the termination petition, beginning on February 23, 2023. Mother testified that she has five children, three with Mr. B. and the two involved in the instant action with Father. She began her relationship with Father in 2012 following her separation from Mr. B. She stated that she and Father first moved to Tennessee in 2013 and have moved back and forth from Tennessee to Ohio a few times since then. She professed that two of her older children lived with her and Father for some time until they returned to Ohio to live with Mr. B. She explained that they did not like the "atmosphere" with Father, who was initially just verbally abusive and limited his actions to things like throwing the Christmas tree. She stated that the abuse was not physical until recently.

She acknowledged her prior custodial episode with DCS, beginning in September 2018. She explained that the Children were removed after discussing Father's domestic abuse at school. She agreed that she was also using drugs at that time and tested positive for methamphetamine the day of their removal. She recalled that she worked on her permanency plan and did everything necessary to get them back. She regained custody on May 17, 2019, after which she took the Children back to Ohio.

Mother testified that they stayed in Ohio for approximately two months before returning to Father, who was still subject to a no contact order. She explained that she did not understand that the order was valid once custody was returned to her. She acknowledged that her drug use resumed shortly after their return and that the Children were again removed following a report of physical abuse in February 2021. She recalled that Father had pointed a BB gun at her and then shot at her and the Children as they ran down the hall. She was not sure whether the Children were hit by the BB gun. She agreed

---

[3] DCS also sought termination of Father's parental rights. He had yet to establish his paternity; however, he surrendered any paternal rights he might possess prior to the termination hearing.

that she probably was using methamphetamine that day and that she failed a drug test for methamphetamine, amphetamine, MDMA, and THC.

Mother agreed that she did not maintain contact with DCS until June 2021, when she was finally arrested and placed in jail. She confirmed that she met with Cayci Byers, the foster care worker assigned to her case in 2018 and again in 2021, while in jail. She confirmed that she was arrested on June 6, June 12, and July 2021 before she moved back in with Father. She claimed that it "got very bad" at that point and that he knocked her teeth out and attempted to run her over with his truck.

Mother acknowledged that she was not initially cooperative with Ms. Byers during the second custodial episode but that she eventually signed paperwork and cooperated, beginning in August 2021. She agreed that Ms. Byers advised her that her cooperation was critical because it had been several months since the time of removal. She recalled that Ms. Byers advised her of the permanency plan requirements and the termination criteria.

Mother testified that she discussed her options with Ms. Byers while she visited with the Children in September. She confirmed that Ms. Byers called several places to secure housing away from Father but that there were no openings in the immediate area at that time. She ultimately returned to Ohio to get away from Father in September 2021. She struggled with addiction once again in April 2022 and failed a drug test that had been ordered as a result of the ICPC. She explained that she was using heroin and did not know it had been laced with fentanyl. She claimed that she never used drugs prior to her relationship with Father. She stated that her drug use "eased the fighting in the relationship" and that her circumstances were not as "miserable" if she used drugs with him. She first used crack cocaine and then progressed to heroin. She professed that it was really hard to quit the fentanyl use and that she finally sought help in July 2022.

Mother testified that she moved in with Mr. B. in October 2022, where she has since remained. She confirmed that she does not pay rent and that her living situation is allowing her to save money. She is currently employed and attempting to fulfill the permanency plan requirements. She related that she completed a few requirements that she had to repeat because of her last positive drug screen. She confirmed that Ms. Byers provided assistance and was "always helping." She stated that her most recent drug screens have been negative. She agreed that the tests were not random and that she secured them herself, a hair follicle that did not specifically test for fentanyl and a urine drug screen. She has also completed 5 of 10 parenting classes and was in counseling for mental health and alcohol and drug use. She stated that Mr. B. would allow the Children to live with her in the residence if she regained custody. She remitted some child support through her employment and was in the process of securing a vehicle from Mr. B. She stated that she would never return to Father and put herself and the Children in such a vulnerable position again. However, she acknowledged some continued contact with Father, explaining that he had messaged her. She estimated that there were approximately 15 messages between them and that she did

not respond kindly to him. She claimed that she would be ready to support herself and the Children without help from Mr. B. in four to five months.

Mother testified that she talked with the Children on the telephone often, that the foster parents brought them for a visit in December 2022, and that she had lunch with them on the day of the hearing. She stated that despite the lack of in person visits, she has maintained a bond with the Children. She explained,

> I have a loving bond with them, and they have a loving bond with me. There is not a story that they will tell you that they were ever afraid of me, that they ever – there's none of that story, because it never happened. I was always very close [with] them.

Ms. Byers confirmed that she has worked with the Children during both custodial episodes. She professed that they are currently placed in a non-adoptive foster home and have been doing well, despite having some "ups and downs." She stated that the Children are stable where they are living and that she would pursue an adoptive home if Mother's rights were terminated.

Ms. Byers testified that Mother did not maintain contact following the second removal and that the first visit occurred in September 2021, when Mother tested positive for methamphetamine, amphetamine, and THC. Ms. Byers confirmed that she contacted several safe houses for Mother but that she was only able to secure placement at one program in Blount County. She stated that Mother declined the opportunity and opted to move to Ohio. She advised Mother that adoption had been added as a concurrent goal on the permanency plan as a result of her lack of progress and that DCS was ready to file for termination. She recalled that she advised Mother to "hit the ground running" in Ohio and assured her that she would work with her if she began completing the requirements.

Ms. Byers confirmed that Mother made progress on the requirements once in Ohio and that she filed the ICPC paperwork as a result of that progress. She stated that, unfortunately, Mother tested positive for fentanyl, resulting in denial of placement. She professed that Mother exhibited a "rapid decline in progress" and was no longer attending meetings and had changed employment several times. She recalled that Mother initially denied drug use but later admitted that she had been taking heroin that she did not know was laced with fentanyl. She agreed that Mother resumed her progress on the permanency plan requirements once the termination petition was filed.

Ms. Byers testified that she spoke with Mr. B. as a result of her initial investigation because he was identified as Daniel's father on the birth certificate. Mr. B. advised her that he was not the father, and she assisted him in filing a denial of paternity. Mr. B. was not agreeable to the Children living with him in Ohio at the time of removal because one of his biological children was living with him at that time.

Ms. Byers testified that she was not comfortable filing a renewed ICPC application because Mother's progress began after the termination petition was filed. She was concerned about Mother's long-term stability as evidenced by her returning to drug use in stressful situations. She acknowledged that Mother did well during the first custodial episode but that she has since learned that Mother was working with Father, despite a court order prohibiting his involvement, when the Children were returned. She doubted whether Father was "completely out of the picture" during the current custodial episode. She expressed concern for the Children, who she claimed have "seen a lot." She said the Children described the drug use and that Daniel was also aware of the physical abuse.

Ms. Byers agreed that the Children remained bonded with Mother, despite having only visited with Mother on four occasions during the current custodial episode. She agreed that they were also not placed in a pre-adoptive home but that DCS would find an adoptive family for the Children if Mother's rights were terminated. She recalled that Mother brought various items with her to visitation and that she had several gifts for them when they visited in December 2022.

Foster mother testified that the Children have been in her home for the past year and two months. She confirmed that Mother participates in video calls at least twice a week and sometimes three times a week with the Children. She estimated that each call lasts approximately one hour. She continued,

> [Mother] helps a lot. If [they] are giving me a hard time and trouble, she will talk to them about what – an appropriate behavior and that they should be respectful to my husband and myself. The [Children] love to talk to her. They're just all the time wanting to call her, wanting to talk. And I know she has a busy work schedule too; so we try to get in as much as possible.

She and her husband also drove the Children to Ohio for an in-person visit in December 2022. She stated that the Children still refer to Mother as "mom" and enjoy a really close relationship with her. She believed the Children might have some adjustment issues if Mother's parental rights were terminated.

Following the hearing, the court issued a final order in which it found that the evidence presented established the statutory grounds alleged. The court also found that termination was in the best interest of the Children. This appeal followed.

## II.  ISSUES

We consolidate and restate the issues pertinent to this appeal as follows:

A.      Whether the court abused its discretion in its admission of evidence.

B.      Whether clear and convincing evidence supports the court's finding of statutory grounds for termination.

C.      Whether clear and convincing evidence supports the court's finding that termination was in the best interest of the Children.

## III.  STANDARD OF REVIEW

Parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988).  This right "is among the oldest of the judicially recognized liberty interests protected by the Due Process Clauses of the federal and state constitutions."  *In re M.J.B.*, 140 S.W.3d 643, 652–53 (Tenn. Ct. App. 2004).  "Termination of a person's rights as a parent is a grave and final decision, irrevocably altering the lives of the parent and child involved and 'severing forever all legal rights and obligations' of the parent."  *Means v. Ashby*, 130 S.W.3d 48, 54 (Tenn. Ct. App. 2003) (quoting Tenn. Code Ann. § 36-1-113(I)(1)).  "'[F]ew consequences of judicial action are so grave as the severance of natural family ties.'"  *M.L.B. v. S.L.J.*, 519 U.S. 102, 119 (1996) (quoting *Santosky v. Kramer*, 455 U.S. 745, 787 (1982)).

Although parental rights are superior to the claims of other persons and the government, they are not absolute and may be terminated upon statutory grounds.  *See In Re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn. 2002).  Due process requires clear and convincing evidence of the existence of the grounds.  *In re Drinnon*, 776 S.W.2d at 97.  A parent's rights may be terminated only upon

(1) [a] finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and (2) [t]hat termination of the parent's or guardian's rights is in the best interest[ ] of the child.

Tenn. Code Ann. § 36-1-113(c).  "[A] court must determine that clear and convincing evidence proves not only that statutory grounds exist [for the termination] but also that termination is in the child's best interest."  *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).  The existence of at least one statutory basis for termination of parental rights will support the trial court's decision to terminate those rights.  *In re C.W.W.*, 37 S.W.3d 467,

473 (Tenn. Ct. App. 2000), *abrogated on other grounds by In re Audrey S.*, 182 S.W.3d 838 (Tenn. Ct. App. 2005).

The heightened burden of proof in parental termination cases minimizes the risk of erroneous decisions. *In re C.W.W.*, 37 S.W.3d at 474; *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). "Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re Audrey S.*, 182 S.W.3d at 861 (citations omitted). It produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established. *In re A.D.A.*, 84 S.W.3d 592, 596 (Tenn. Ct. App. 2002); *Ray v. Ray*, 83 S.W.3d 726, 733 (Tenn. Ct. App. 2001); *In re C.W.W.*, 37 S.W.3d at 474.

In 2016, the Tennessee Supreme Court provided guidance to this court in reviewing cases involving the termination of parental rights:

An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness.

*In re Carrington H.*, 483 S.W.3d 507, 523–24 (Tenn. 2016) (citations omitted); *see also In re Gabriella D.*, 531 S.W.3d 662, 680 (Tenn. 2017).

In the event that the "resolution of an issue [] depends upon the truthfulness of witnesses, the trial judge, who has had the opportunity to observe the witnesses and their manner and demeanor while testifying, is in a far better position than this Court to decide those issues." *In re Navada N.*, 498 S.W.3d 579, 591 (Tenn. Ct. App. 2016) (citing *McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. 1995); *Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997)). "[T]his court gives great weight to the credibility accorded to a particular witness by the trial court." *In re Christopher J.*, No. W2016-02149-COA-R3-PT, 2017 WL 5992359t, at *3 (Tenn. Ct. App. Dec. 4, 2017) (citing *Whitaker*, 957 S.W.2d at 837).

# IV. DISCUSSION

## A.

As a threshold issue, Mother argues that the trial court erred in its admission of the review and permanency hearing orders from the underlying juvenile dependency and neglect action. "Generally, the admissibility of evidence is within the sound discretion of the trial court." *Mercer v. Vanderbilt Univ., Inc.*, 134 S.W.3d 121, 131 (Tenn. 2004). "The trial court's decision to admit or exclude evidence will be overturned on appeal only where there is an abuse of discretion." *Id.* Improper admission or exclusion of evidence requires a new trial if the outcome of the trial was affected. Tenn. R. App. P. 36(b); *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 223 (Tenn. Ct. App. 1999).

At the hearing, Mother objected to the entry of a certified copy of the entire juvenile court record from the underlying dependency and neglect hearing. The parties then discussed each exhibit included in the collection and ultimately agreed to the admission of several documents. The court held consideration of the remaining documents in abeyance throughout the hearing before ultimately admitting all documents in its final order. Mother posits on appeal that the blanket admission of entire certified records from the juvenile court has been strongly discouraged by the appellate courts. She notes that the documents considered were not appealable orders and should not have been given a res judicata effect. We agree that only those documents considered by and admitted by the trial court are properly included in the record.

Here, the trial court considered the challenged documents and ultimately agreed to the admission of "all of the documents," specifically those detailing Mother's contact with Father.[4] The court found that Mother's ongoing contact with Father was a major concern in its decision, thereby establishing the relevancy of the documents. Such contact was detailed in several of the challenged orders, specifically the protective custody order and the review order for the trial home placement that issued the no contact order. Further, these documents were not given preclusive effect as intimated by Mother. The evidence presented at the hearing also evidenced Mother's continued contact with Father through her own testimony and testimony from Ms. Byers. We find no abuse of discretion in the trial court's admission of the challenged documents.

---

[4] Mother argues that the court's order limited its admission to those documents that referenced Mother's contact with Father. We read no such limitation in the court's order and find that those documents not detailing her contact with Father were also relevant in considering her compliance as a whole.

B.

As indicated above, the trial court granted the termination petition based upon the following statutory grounds: (1) the persistence of conditions which led to removal; (2) substantial noncompliance with the permanency plans; and (3) failure to manifest an ability and willingness to assume custody of the Children. Mother objects to the court's application of each ground of termination. We will address each ground in turn.

1.      Persistence of conditions

As a threshold issue, Mother claims that the ground of the persistence of conditions was not properly pled in the termination petition. The title for this termination ground in the petition identified Father as the respondent; however, Mother was identified in the body of the petition as the responding party. Mother objected at trial, and the trial court ruled that she obtained adequate notice of the ground as evidenced by the entirety of the petition. We agree with the trial court and will now address the application of this ground.

Under Tennessee law, a trial court may terminate parental rights when:

(3)(A) The child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:

(i)      The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;

(ii)      There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and

(iii)      The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home[.]

Tenn. Code Ann. § 36-1-113(g)(3). Termination of parental rights requires clear and convincing evidence of all three factors. *In re Valentine*, 79 S.W.3d at 550. Additionally, the persistence of conditions ground may only be applied "where the prior court order removing the child from the parent's home was based on a judicial finding of dependency, neglect, or abuse." *In re Audrey S.*, 182 S.W.3d at 874.

- 10 -

The record reflects that the conditions which led to removal were child safety concerns due to drug abuse and domestic violence. While Mother has made progress once again, she did not submit to regular and random drug screens and had not completed a new assessment following her positive drug screen for fentanyl by the time of the hearing. Mother had also made similar progress following the first removal of the Children in 2018 prior to the current custodial episode with the same issues. As to the domestic violence, questions remain as to whether Mother has maintained contact with Father. She also did not complete her domestic violence education prior to the hearing. Similarly, Mother violated the no contact order in the first custodial episode, resulting in further domestic violence and concerns of child abuse. Other conditions also exist that would cause the Children further neglect, namely Mother has not established a stable living environment for the Children, having moved in with her ex-husband, who previously advised that he was not amenable to their placement with him. Following our review, we conclude that there is little likelihood that the conditions which led to removal and other conditions now found will be remedied at an early date so that the Children can be safely returned in the near future and that the continuation of the parent's relationship greatly diminishes their chances of early integration into a safe, stable, and permanent home. Accordingly, we affirm the trial court on this ground of termination.

### 2. Substantial noncompliance

First, Mother argues that the trial court failed to find that her noncompliance was substantial and instead found that she had not substantially complied with the requirements. The record reflects that the court cited the appropriate standard, considered the requirements and their application, and ultimately found that termination was warranted on this ground. Further, this court must make its own determination as to whether the facts support the application of this ground of termination by clear and convincing evidence. *In re Carrington H.*, 483 S.W.3d at 523–24.

A court may terminate a parent's parental rights when the parent is in "substantial noncompliance . . . with the statement of responsibilities in a permanency plan." Tenn. Code Ann. § 36-1-113(g)(2). To terminate rights under this ground, the court "must first find that the plan requirements are reasonable and related to conditions that necessitate foster care placement." *In re Hannah H.*, No. E2013-01211-COA-R3-PT, 2014 WL 2587397, at *10 (Tenn. Ct. App. June 10, 2014). "Conditions necessitating foster care placement may include conditions related both to the child's removal and to family reunification." *In re Valentine*, 79 S.W.3d at 547. "The trial court must then find that the noncompliance is substantial." *In re Hannah H.*, 2014 WL 2587397, at *10 (citation omitted). When determining whether the noncompliance was substantial, the court must do more than "count[ ] up the tasks in the plan to determine whether a certain number have been completed." *In re Carrington H.*, 483 S.W.3d at 537. DCS must show "that the parent's noncompliance is substantial in light of the degree of noncompliance and the

- 11 -

importance of the particular requirement that has not been met." *In re M.J.B.*, 140 S.W.3d at 656 (citing *In re Valentine*, 79 S.W.3d at 548–59; *In re Z.J.S.*, No. M2002-02235-COA-R3-JV, 2003 WL 21266854, at *12 (Tenn. Ct. App. June 3, 2003)).

As indicated above, Mother was advised of the following permanency plan requirements: (1) obtain an alcohol and drug assessment and follow recommendations; (2) refrain from socialization with known drug users; (3) refrain from substances that will yield a positive result for THC, specifically Delta 8 CBD; (4) submit to random drug screens; (5) complete a mental health assessment and follow recommendations; (6) participate in individual counseling with an emphasis on anger management and domestic violence; (7) refrain from acts of violence in front of the Children; (8) arrive on time for visitation and provide necessary items; (9) provide a rental lease agreement in her name; (10) pay child support; (11) obtain and maintain residential stability for six months with working utilities in her name; (12) provide a valid driver's license, proof of insurance, and vehicle registration; (13) maintain contact with DCS and notify of any changed circumstances within 24 hours; (14) provide proof of legal income; (15) participate in parenting classes; and (16) participate in domestic violence support groups.

The record reflects that Ms. Byers went above and beyond in her attempts to assist Mother in completing the requirements and that she submitted the paperwork for the ICPC process when Mother showed progress. However, Mother tested positive for fentanyl in April 2022. By the time of the hearing, Mother had also not obtained her own residence and maintained residential stability, obtained a vehicle, completed the necessary assessments following the positive drug screen, paid child support in full, or completed parenting classes as required. While Mother claims that she had difficulty securing random drug screens, we note that Mother chose to move to Ohio when there was another resource available in a nearby county and that Ms. Byers' request for help through the ICPC process was denied as a result of Mother's continued drug use. All of these requirements were necessary to establish Mother's ability to provide a home for the Children free of drug abuse and domestic violence. The record overwhelmingly establishes that Mother's noncompliance was substantial and that clear and convincing evidence supported this ground of termination.

3. Failure to manifest an ability and willingness to assume custody

Pursuant to Tennessee Code Annotated section 36-1-113(g)(14) parental rights may be terminated when:

> A parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or

- 12 -

psychological welfare of the child.

Tenn. Code Ann. § 36-1-113(g)(14). This ground requires the petitioner to prove two elements by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c)(1), (g)(14); *In re Neveah M.*, 614 S.W.3d 659, 674 (Tenn. 2020). First, a petitioner must prove that the parent failed to manifest an ability and willingness to personally assume legal and physical custody or financial responsibility of the child. *In re Neveah M.*, 614 S.W.3d at 674. Second, a petitioner must prove that placing the child in the parent's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child. *Id.*

As to the first element, our Supreme Court has instructed as follows:

[S]ection 36-1-113(g)(14) places a conjunctive obligation on a parent or guardian to manifest both an ability and willingness to personally assume legal and physical custody or financial responsibility for the child. If a person seeking to terminate parental rights proves by clear and convincing proof that a parent or guardian has failed to manifest either ability or willingness, then the first prong of the statute is satisfied.

*Id.* at 677 (citation omitted).

As to the second element, whether placing the child in the parent's custody "would pose a risk of substantial harm to the physical or psychological welfare of the child," we have explained:

The courts have not undertaken to define the circumstances that pose a risk of substantial harm to a child. These circumstances are not amenable to precise definition because of the variability of human conduct. However, the use of the modifier "substantial" indicates two things. First, it connotes a real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. While the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.

*In re Virgil W.*, No. E2018-00091-COA-R3-PT, 2018 WL 4931470, at *8 (Tenn. Ct. App. Oct. 11, 2018) (quoting *Ray*, 83 S.W.3d at 732 (footnotes omitted)).

While we agree that Mother was willing to care for the Children, the record reflects that Mother did not evidence sustained sobriety by the time of the termination hearing and had not established her ability to provide a suitable residence for them. Mother admitted that it would take an additional four to five months with help from her ex-husband to ready herself for their return. From these facts, we agree with the trial court that Mother displayed

- 13 -

an overall lack of an ability to assume legal and physical custody of the Children. The record further supports a finding that placing the Children with her would pose a risk of substantial physical or psychological harm to their welfare. Mother established a clear pattern of her inability to maintain any progress in her drug addiction. Further, questions remain as to whether she would maintain her distance from Father if the Children were returned. Indeed, the trial court found as follows:

> The court does not find [Mother] to be credible when she testified that her relationship with [Father] is over. The court does not believe that her relationship with [Father] is over or at a permanent end. Based upon this court's observation of [Mother] and her demeanor during the trial, and based upon her testimony, the court fears that her relationship with [Father] is simply at an end until this litigation is over. Thus, the court believes [the Children] would very likely be placed back in harm's way by [Mother] if and/or when she is given custody of [the Children].

With all of these considerations in mind, we affirm the court's judgment terminating Mother's parental rights on this ground.

## C.

Having concluded that there was clear and convincing evidence supporting at least one statutory ground of termination, we must now consider whether termination of Mother's parental rights was in the best interest of the Children. Tenn. Code Ann. § 36-1-113(c)(2); *In re Audrey S.*, 182 S.W.3d at 860. After a court finds that clear and convincing evidence exists to support a termination ground, "the interests of the parent and the child diverge" and the court focuses on the child's best interest. *In re Audrey S.*, 182 S.W.3d at 877. A finding that at least one ground for termination of parental rights exists does not necessarily require that a parent's rights be terminated. *Id.* Because some parental misconduct is redeemable, Tennessee's termination of parental rights statutes recognize "that terminating an unfit parent's parental rights is not always in the child's best interests." *Id.* The facts a court considers in the best interest analysis "must be proven by a preponderance of the evidence, not by clear and convincing evidence." *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). After making the underlying factual findings, the court "should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest." *Id.*

The statutory best interest factors applicable to this action are as follows:

(i)(1) In determining whether termination of parental or guardianship rights is in the best interest of the child, the court shall consider all relevant and

child-centered factors applicable to the particular case before the court. Those factors may include, but are not limited to, the following:

(A)     The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;

(B)     The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;

(C)     Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;

(D)     Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;

(E)     Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;

(F)     Whether the child is fearful of living in the parent's home;

(G)     Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;

(H)     Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;

(I)     Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;

(J)     Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;

(K)     Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

(L)     Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

(M)     Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

(N)     Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;

(O)     Whether the parent has ever provided safe and stable care for the child or any other child;

(P)     Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q)     Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

(R)     Whether the physical environment of the parent's home is healthy and safe for the child;

(S)     Whether the parent has consistently provided more than token financial support for the child; and

(T)     Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

(2)     When considering the factors set forth in subdivision (i)(1), the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest.

(3)     All factors considered by the court to be applicable to a particular case must be identified and supported by specific findings of fact in the court's

written order.

> (4)     Expert testimony is not required to prove or disprove any factor by
> any party.

Tenn. Code Ann. § 36-1-113(i). "This list is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's parental rights is in the best interest of a child." *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). The General Assembly has also stated that "when the best interest[ ] of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interest[ ] of the child, which interests are hereby recognized as constitutionally protected." Tenn. Code Ann. § 36-1-101(d); *see also White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004) (holding that when considering a child's best interest, the court must take the child's perspective, rather than the parent's). We will group our discussion of the best interest factors "based on the overarching themes within the list of twenty factors" under the circumstances of the case because many of these factors touch on similar factual predicates and involve similar issues. *In re Chayson D.*, No. E2022-00718-COA-R3-PT, 2023 WL 3451538, at *14 (Tenn. Ct. App. May 15, 2023).

We consider first the Children's emotional needs. *See* Tenn. Code Ann. § 36-1-113(i)(1)(A) (concerning the need for stability), (B) (concerning how changes in caretakers affect wellbeing), (D) (concerning the parent-child attachment), (E) (concerning visitation), (F) (concerning whether the children are fearful of the parent), (H) (concerning attachment to others), (I) (concerning relationships with others), (T) (concerning the parent's mental and emotional fitness and its corresponding impacts). With respect to these factors, the Children are in need of stability as evidenced by this being their second custodial episode as a result of the same issues, e.g. drug abuse and domestic violence. While the Children have maintained a bond with Mother, they are doing well with their foster family and deserve the chance to achieve permanency. Mother chose to move to Ohio and is unable to maintain regular in-person visitation but has maintained telephone contact. Mother's failure to sufficiently address her drug addiction while apart from the Children evidence a lack of concern for their need for stability and her parental role. Questions also remain as to Mother's mental fitness as evidenced by her hospitalization for drug-induced psychosis.

We turn next to the Children's physical environment and well-being. *See* Tenn. Code Ann. § 36-1-113(i)(1)(G) (concerning whether the parent's home triggers or exacerbate the children's experience of trauma or post-traumatic symptoms), (O) (involving the parent's prior provision of safe and stable care to any child), (Q) (involving the parent's commitment to having a home that meets the children's needs), and (R) (involving the health and safety of the home). Mother has failed to establish a suitable home for the Children throughout the custodial episode. Mother returned to an abusive

- 17 -

environment with the Children, evidencing her inability to maintain a commitment to provide a home that is safe for the Children.

Next, we consider Mother's efforts. *See* Tenn. Code Ann. § 36-1-113(i)(1)(C) (involving the parent's continuity in meeting the children's needs), (J) (involving the parent's lasting adjustment of circumstances), (K) (involving the parent's use of available resources), (L) (concerning efforts made by DCS); and (M) (concerning the parent's sense of urgency in addressing the circumstances that led to removal). Mother's failure to address her drug addiction and to maintain contact with DCS evidenced her lack of effort to meet the Children's needs. She has also not exhibited a sense of urgency in addressing the circumstances which led to removal, despite great efforts expended by Ms. Byers.

With regard to support and knowledge of the Children's needs, Tenn. Code Ann. § 36-1-113(i)(1)(S) (addressing the parent providing more than token support), (P) (addressing the parent's understanding of their needs), the record reflects that Mother has provided some support but was not able to fully provide for them at the time of the hearing.

The trial court considered all the evidence, weighed the credibility of the witnesses, and concluded that the best interest factors supported termination. Upon our review of the evidence, we agree with the trial court's assessment and findings. Accordingly, we conclude that clear and convincing evidence in the record supports a determination that termination of Mother's parental rights was in the Children's best interest.

## V.    CONCLUSION

The judgment of the trial court is affirmed. The case is remanded for such further proceedings as may be necessary. Costs of the appeal are taxed to the appellant, Tylena B.

_____
JOHN W. McCLARTY, JUDGE